The next matter, number 23-1817, Carrie MacRae v. Matthew Mattos et al. At this time, would counsel for the appellant please introduce himself on the record to begin? Good morning. May it please the Court? Michael Bekesha on behalf of Plaintiff Carrie MacRae, and I'd like to reserve two minutes. You may, and please proceed. We are here today because Ms. MacRae was fired for speech that took place months before she started working at Hanover Public Schools. The speech concerned issues of national significance, specifically the public debate on immigration policy, racism, and gender identity. The speech was posted anonymously on TikTok. It was not directed at Hanover Public Schools in any way, nor did the speech concern Hanover Public Schools, any administrators there, any teachers, any parents. If she had posted it on August 31, would you still be making the same argument? We would not be making the same argument, Your Honor. How much in advance is it public versus private? I think the question, the way we view the situation is looking at, starting with Garcetti and the line of cases that this Court has adopted since, a condition of employment is individuals having lesser rights, lesser freedoms than they would a public citizen. And so if Ms. MacRae accepted the position on August 31, the condition of her employment would be some of her freedoms. Usually you see First Amendment and Fourth Amendment come up most frequently in government employment cases. On August 30, then, you're saying that it would still be private speech without any other consideration as to the impact that that speech may have had on her prospective employer. I think we're getting into a gray area because of, you know. I'm just trying to figure out where the gray is. I appreciate that, Your Honor. The trouble I have is I don't, once she was interviewed for the position, offered the position, accepted the position, whether contract was signed or informal offer and acceptance over the phone, which most likely happened in this instance and happens most of the time, then I think that the conditions are then placed. But here we're talking about speech that took place four months, five months prior before she even applied for the position. So when she engaged in the speech, she didn't even know. Was the speech still on the website at the point that she was hired? I do not believe it was, Your Honor. At some point, TikTok removed the speech from its website. There's no clear record and the precise date is my understanding of when it was removed. However, it was not made public until after she had started working. It was made public during her campaign, right? Well, it depends what you mean by making public. She posted videos pursuant to her campaign advertising, correct? Correct. On the day of the election, she posted a video, as well as several months prior, she posted four memes. That's public, isn't it? It is public, Your Honor. Yes. The reason I was hesitant there was simply because, at least for the memes, her name was not associated with it, and so it would take some effort for somebody to identify her as the speaker in that instance. But once she posted it with a campaign video, it was pretty apparent. And that's how it was eventually located and brought to the attention of the Boren School Committee. Yes, Your Honor. But it was a condition, all of the cases, every single case cited by the school district, all the cases that plaintiff has located, the speech has taken place while the employee is employed by the government. It was at that point that this condition of employment occurred. She could not have been, there was no condition of employment about what was said prior. That just is not only impossible, but just makes little sense. There was the one case out of California that the district court cited, but in that instance it was an unrelated speech. In that instance, the individual was hired to be the head of communications for a local government entity, and she had previously not only criticized the government entity, but the communications department that she was going to head. And so that case is very different from what we have here, because it includes related speech, not unrelated speech. You don't think this is related to her job as a classroom teacher, teaching diverse students? I think it's related to the extent she has views on issues of significant national importance, and that she has students that are diverse, may fall into the categories that she had views on, and she expressed those views on. However, there is no evidence whatsoever that she brought those views into the classroom, whether it was Hanover Public Schools classrooms or any classroom that she ever taught in. In fact, she informed the principal during the interview, during the investigation, that one of her first few days in the classroom, she asked students, you know, was there anything they wanted to talk to her about after class? A student approached her with proper pronouns or the preferred pronouns that student would like to be used, and Ms. McRae was using those preferred pronouns. And so there was, the speech did not concern any particular student. It did not concern the students. What it concerned were questions of political interest, questions of public debate, whether or not our immigration policies are broken in this country, and I think everybody agrees they are. You know, questions on what, you know, is it correct, is it proper, is it fair for individuals identifying as different genders to be participating in school sports of their, the gender they identify as. Those are questions that are being debated across the country these days. These are the questions, these are the issues that she spoke about. She did not speak about a particular student, about a particular classroom, or about anything that had to do specifically with Hanover Public Schools. And so this was unrelated speech of political significance that took place prior to her being employed. And if, you know, if the test. When you say it's unrelated speech, you're not arguing that it is appropriate speech for a classroom teacher? It's not. If she had made the same remarks at her job interview, she wouldn't have gotten the job. I don't know if she would have gotten the job or not, but she didn't make the statements in the job interview, nor did she make these statements in the classroom. This was not classroom speech. This is different from cases where teachers have been fired or have been reprimanded because they spoke their personal views in the classroom or on the school premise or as a teacher. Here, she was speaking before she was employed there. So what's the rule of law you want us to write? That if before you're hired, unbeknownst to your prospective employer, you make deleterious and inappropriate remarks, and the employer finds out only after you have started work that the employer is stuck with you? Is that the rule you want us to write? Well, I think it partly depends on what the speech at issue is. The speech here is speech on political issues of public importance of the day. What's the rule? What rule do you want us to employ about prior speech? The rule is that the Pickering-Garcetti balancing test does not apply to pre-employment speech. That what pre-employment speech is speech that the conditions have not been set yet. And so, you know, whether- You're telling us what you don't want us to apply. What do you want us to apply? That's what Judge Selye is asking you. Sure. The traditional test for First Amendment retaliation for a basic public citizen, which is did the person speak, engage in First Amendment-protected activities, and did the government entity take action adversely to that person based on that speech? So no matter how vile the speech, because you protect vile speech. We do. So no matter how vile the speech, the employer, if it's pre-employment hire, has no interest in that speech, period. That's the rule you want us to apply. No balancing. In other words, strike out the middle balancing. It would strike out the middle balancing, Your Honor. And I guess I would say that it depends also how you define vile. To the extent the speech is, you know, we can take the NAMBLA example that the courts have looked at before, examples of other speech that the First Circuit, Your Honors, have addressed, which is speech about Nazis. If it's speech that – Yeah, but where do you draw – I was going to ask, if you're talking about, let's assume she was a member of a neo-Nazi party and said there should be a new Holocaust, or she's a card-carrying member of the KKK and she's supporting the lynching of black Americans across the nation. How do you draw the line between those statements and – I mean, there's a security and a harm risk there. If the person's asking for legal action, for the – you know, if the person is engaging in speech saying that individuals should be lynched or that there should be a Holocaust, I mean, of course, that goes beyond the First Amendment protections. Her speech was the Holocaust never occurred. I am of the opinion the Holocaust never occurred, or that black Americans were never lynched by the KKK. That's an opinion. She's not advocating for that. Would you draw the line there? I think – Because it isn't a slippery slope. It's difficult questions to be asked. The speech that is at issue here is not similar to speech promoting lynching, promoting Holocaust. I don't think they're – I'm sorry, Your Honor. But if it's opinion speech about events that occurred in the past, then, you know – Well, I think they're – you know, whether or not black Americans were lynched during the history of our country, I don't think that's in dispute. I also haven't heard public debates about whether or not we should acknowledge that lynchings occurred or didn't occur. And similar to whether or not the Holocaust occurred, there is a fringe group out there that would say the Holocaust did not occur. But that's not going towards issues that are being debated publicly today. The speech that Ms. McRae posted, the speech – and as the district court recognized, go to issues of national discussion these days. Is our immigration system – So everything is being debated publicly these days. Everything. So is everything off limits? Well, it depends what everything is. I'm not sure I would accept the premise that everything is being debated and everything is legitimately being debated and being discussed. You don't spend enough time on YouTube. I try not to, Your Honor. Okay, you have two minutes for rebuttal. Let's hear from opposing counsel. Thank you, Your Honor. Thank you, counsel. At this time, the counsel for the appellees will please introduce himself on the record to begin. May it please the court, Craig Pegney for the appellees. My brother, towards the end of his remarks, said something to the effect of what is not in debate. And I'll tell you what's also not in debate is that trans kids are real. People who are black are real. People who are LGBTQ plus are real. And those same kids are students at the Hanover Public Schools. That is undisputed. One of the things that my brother just struggled with is drawing the line or how to draw the line between the speech in question and the employer's responsibility or an employee's responsibility for that employer. We're talking about a schoolteacher here. We're talking about a schoolteacher who has to uphold the district's values. That's one of the things that the lower court found, was that there are two or three different core values of the Hanover Public School District that Ms. McRae violated with her speech. That is an employer requirement, and her speech, there is absolutely no question, violated that. That's important because if you're one of those kids that I mentioned at the start, you are then in the position of having to sit in Ms. McRae's classroom and be taught by a person who has messaged to the world that they disagree with who you are. And that goes to the core of the case. The case is all about, in addition to the... Is there any kind of remoteness issue? I mean, we all talk about youthful indiscretions. I mean, suppose this is said when you are in college and there's nothing more recent that reflects that you still harbor those same positions. Yeah, so a couple of things on that, yeah. One is, it's sort of black-letter law under the Pickering-Garcetti analysis that you can take the time, place, and manner of the speech into question. That is sort of a flexible, malleable standard that applies to any and all situations, including this. So to your question, if it were August 31st, 30th, a month ago, a year ago, that's part of the analysis. On the facts, it's a little bit different here, right? Because what we know is that once whoever it was messaged that the TikTok posts were an issue for the Bern-Born School Committee, which is where she was a school committee member, it went, you know, to use the sort of phrase, went viral, right? It got out, it caused a maelstrom in Born. And Hanover then, upon learning that what happened, knew that this was coming their way, which goes to the disruption argument, if we need to get there. But to your question, yes, the time matters, but also how it plays out matters. And that's part of the time, place, and manner analysis. And I think that's exactly why that part of the analysis is the applicable part of it. What my brother struggled with when one of the judges asked him about, well, what would be the proper standard, he struggled to articulate one, because there is one, and it's precedent here in the First Circuit, right? The Garcetti Pickering Balancing Test is exactly the kind of thing that has been applied time and again, and is the appropriate standard for this case, because it takes into consideration the government interest. The Nahas Reality Standard that my brother, I think, is trying to say that should be the appropriate standard absolutely takes no consideration into the government interest. And this is why the government has a legitimate interest in making sure that there is no disruption to the services that it offers. But even more so in this context, that it is employees who are fostering an inclusive environment for the students in which they're being taught. There's absolutely no question in this case, no question, that Ms. McRae's posts violated those mission statements. It's inescapable. When I read through my brother's papers, I struggled to understand exactly what the standard would be that he would want to be applied, because the Nahas Reality Standard is a private corporation, and it's only the causality between is there a constitutional violation, and after the constitutional violation, is there some kind of causality? As Your Honor had pointed out, there's no room in there for the government interest. So I think we can dispense with that. We can also dispense with the other arguments when it comes to the disruption, i.e., one, is there an actual disruption standard? Yes, there is. That's what the First Circuit says in current versus cousins. And whether or not that should have been for the jury? No, it should not have been. That's part of black-letter law in terms of the two-pronged analysis that are left for the court. So what I'm finding is my brother trying to reach towards unpublished decisions in other circuits to have this court adopt some kind of precedent that it has always used. So I don't know what the argument is at this point in terms of why there is an appeal issue. I'm happy to answer questions, but otherwise, I don't want to sort of build on it. Let me just ask it since it's a more practical question. And, again, it might not affect or go into the analysis, but isn't this something that could have been avoided if, for example, when she was going to be hired in the application, have you ever given any speeches that talk about X, Y, or Z? And if she said no and then you found out later that's the way to terminate her, isn't this something perhaps some more due diligence could have been done? Perhaps, Your Honor. I think that's out of the scope of the inquiry here. That's what I'm saying. And maybe if there had been some kind of upfront inquiry about that, but that's not what happened here. What happened was the TikTok post got out. We know that there was a huge controversy in Bourne, and that's how it sort of fell into Annenberg's lap. And once they got it, they did everything that they should have done. If you want to talk about process, they did an investigation. They sat down with Ms. McRae, and I think it is hugely important to note that during that interview, not once but twice, Ms. McRae acknowledged that her comments would cause a disruption. I'm paraphrasing. It would cause a disruption to the learning process within Hanover. That is an enormous admission by Ms. McRae herself and defeats on its face any argument that somehow  Ms. McRae admitted that this was the case, that her comments would, in fact, cause issues for the students in her own classroom and would cause disruption to learning. That's not even getting to all of the other evidence that talks about the possibility for disruption, if not the actual disruption that was already starting to occur. And what I mean by that is teachers saying, wait a minute, this is not something that we should have as a fellow teacher in our system posting about because it's entirely contrary. It's antithetical to everything that we stand for. The kids were starting to talk about it. The families were starting to talk about it. We know that in Bourne, it had already become a huge issue. Of course it was going to be coming to Hanover. So you have evidence of actual disruption, but that's not actually important because in Courant vs. Cousins, they talk about that it's the reasonable prediction of disruption that matters. And the prediction here was, of course, reasonable. And again, you know that because of Bourne, but also based on the facts themselves. Everything that the district had in terms of the evidence in front of it said that this was going to be an enormous problem, an enormous disruption to teaching and learning. But again, the case law is clear. You don't actually have to have, I think is what the case is saying, is the steps unfold towards actual disruption. You can make a threshold decision at some point, and that threshold decision, the case law is clear, the employer's judgment weighs heavily. There is sort of a default where they rely on the employer's judgment. So I struggle to find a way in where a plaintiff can say that there is some sort of live issue here before the court. The court was clear-eyed as to the facts, the same that I hope the court is here today, and applied black letter law on the First Circuit, pointing to some kind of unpublished decision or some other decision outside the circuit that has nothing to do with what is the public employee First Circuit standard here. Thank you. Thank you. Okay, let's hear a rebuttal. Mr. Bekesha, you have two minutes. Thank you. Michael Bekesha on behalf of Appellant. Counsel just said it's the black letter law, and it's been applied time and again in the circuit. It has to speech that took place while a government employee was employed. It has never been applied. It is not precedent. It's not black letter law when it comes to pre-employment speech. Counsel is asking this court to make that jump, make that leap, and say at any point, any time before you apply for a job, get hired by the government employee, if you say something and the employer finds out about it after you're employed, they can fire you for it. That's going to be a problem. That's going to put a muzzle on any individual that may want to apply for a government job. That's teachers. That's law enforcement. I mean, I know judges are— and then make it a rebuttable presumption that the firing was for an improper reason with the showing of disruption. I'm still trying to figure out what test you want us to apply. The test is the government cannot retaliate against an individual because of their speech. Now, I know that sounds— All right, so then you're saying that the rebuttal would be we're not retaliating because of speech. We're retaliating because what the speech will likely cause? What it could cause, what the dangers could be, if it's violent speech, there are real harms that could go into play, but it's not the traditional balancing test of weighing the interests. I mean, the courts have looked at this issue when it comes to political affiliation. Can a government employer not hire somebody because they are a Republican? And the courts have said, well, it depends what the job is, right? If you're looking to apply to a governor's office as a janitor, then you absolutely cannot look at political affiliation. But if they're looking to be the chief of staff to the governor, and the governor happens to be a Democrat, then of course you can look because they're not going to be able to carry out their job because they disagree with the policies of the person they will be working for. And so the courts do— I don't have a clue how that, what you just said, supports your argument. Because you're talking about someone who has said what she said and is applying to be a teacher, where what she said matters in the classroom. Well, there are two points on that, Your Honor. One is counsel said that she violated the core values. Well, how do you violate something prior to having to comply with the core values? So that's the first problem. I think Judge Halepi got to that point saying she was never asked, you know, about prior speech. She didn't sign a contract that said if we find out that you've, in a previous life, no matter when it was, 15, 20, 30 years prior, said something that may have violated the core values and you weren't upright about it, we could terminate you. That didn't come—that wasn't the case. But the other issue is counsel said that the speech told the students that she disregarded who they were. That's not what the speech was. The speech was memes about policy, not about individuals. It did not say that somebody did not have a right to identify the way they want to identify. It didn't say that. It did not say that somebody that may be here illegally is not a human or an individual. What her speech said is it focused on the broken system of our immigration laws. It focused on whether or not individuals that identify as males should—I'm sorry, identify as females should participate in school sports as, you know, in female school sports. That's not saying that somebody doesn't have a right to identify or that my client would treat them any differently. She was communicating. She was speaking about policies. There's a difference between attacking individuals and discussing policies. And her focus was policy. And because of that, she had a right to speak, and the government does not have a right to retaliate against her simply because it did not like her policy positions. Okay. Thank you, counsel. Thank you. Okay. Court is adjourned on today.